IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| RYAN M. ROWE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No.: _____ |
| | ) | Judge: _____ |
| FRESENIUS MANAGEMENT | ) | |
| SERVICES, INC., and | ) | |
| FRESENIUS MEDICAL CARE | ) | **JURY DEMAND** |
| HOLDINGS, INC., d/b/a FRESENIUS | ) | |
| MEDICAL CARE NORTH AMERICA | ) | |
| | ) | |
|     Defendants. | ) | |

_____

**COMPLAINT**
_____

COMES NOW, the Plaintiff, RYAN M. ROWE, by and through counsel, who hereby sues

the Defendants, FRESENIUS MANAGEMENT SERVICES, INC., and FRESENIUS MEDICAL

CARE HOLDINGS, INC., d/b/a FRESENIUS MEDICAL CARE NORTH AMERICA, and would

show unto this Honorable Court as follows:

1.　　Plaintiff, Ryan M. Rowe, is a citizen and resident of Knoxville, Knox County,

Tennessee.

*2.*　　Defendant, Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care

North America, is a corporation organized under the laws of the State of New York, authorized to

do business in the State of Tennessee, with its principal place of business located at 920 Winter

Street, Waltham, MA 02451-1521, and may be served with process through its Registered Agent,

C T Corporation System, located at 28 Liberty Street, New York, NY 10005.

3.　　Defendant, Fresenius Management Services, Inc., is a corporation organized under

the laws of the State of Delaware, authorized to do business in the State of Tennessee, with its principal place of business located at Tax Dept., 920 Winter Street, Waltham, MA 02451-1521, and may be served with process through its Registered Agent, C T Corporation System, located at 300 Montvue Road, Knoxville, TN 37919-5546.

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit: False Claims Act, 31 U.S.C. § 3729, *et seq.*, and pursuant to the doctrine of Supplemental Jurisdiction, 28 U.S.C. § 1367.

5.      Venue is proper under the code provisions of 29 U.S.C. § 1391.

6.      This action is brought pursuant to the provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

7.      At all times material hereto, Defendants were subject to the provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

8.      At all times material hereto, the Defendants were employers subject to the provisions of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

9.      At all times material hereto, the Defendants were employers engaging in an industry affecting commerce.

10.      At the time of Plaintiff's termination, the Defendants collectively employed more than five hundred (500) employees.

11.      At all times material hereto, Defendants were subject to the provisions of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

12.      At all times material hereto, Defendants were subject to the provisions of 18 U.S.C. § 287 – False, Fictitious or Fraudulent Claims.

13.      At all times material hereto, Defendants were subject to the provisions of 18 U.S.C.

§ 1347 – Health Care Fraud.

14.     Violations of the above-referenced statutes can subject Defendants to both civil and criminal penalties.

15.     The above-referenced statutes were enacted to protect the public health, safety and welfare.

16.     The above-referenced statutes reflect clear and unambiguous statements of public policy.

17.     At all times material hereto, the Defendants are a subsidiary of Fresenius Medical Care AG & Co. KGaA, a German corporation, with the legal form of a partnership limited by shares, headquartered at Else-Kroner-Str. 1, 61346 Bad Homburg, Germany. Fresenius Medical Care's shares trade on the Frankfurt Stock Exchange (ticker: FME), and its American Depository Receipts trade on the New York Stock Exchange (ticker: FMS).

18.     At all times material hereto, the Defendants conduct operations through five principal subsidiaries: National Medical Care, Inc., Fresenius USA Marketing, Inc., Fresenius USA Manufacturing, Inc., and SRC Holding Company, Inc., all Delaware corporations, and Fresenius USA, Inc., a Massachusetts corporation.

19.     At all times material hereto, the Defendants and its parent company, Fresenius Medical Care AG & Co. KGaA, hold themselves out as one of the world's largest providers of dialysis products and services, with a global network of over 3,200 dialysis clinics in 45 countries, providing services to hundreds of thousands of patients with renal disease.

20.     During his employment, Plaintiff received his W-2s from Defendant Fresenius Management Services, Inc.

21.     At all times material hereto, in relevant part, Defendants are in the business of

providing dialysis treatment to patients with renal disease; End-Stage Renal Disease ("ESRD"), which is a highly competitive and saturated market, and requires Defendants to enter into contracts with hospitals and other healthcare providers to provide dialysis treatment to their patients.

22.     At all times material hereto, the Defendant(s) are providers and participants in federally-funded health insurance programs, including Medicare and Medicaid (hereinafter "Government Payors"), that pays for the costs of certain health care services and items on behalf of eligible beneficiaries based on age, disability, or affliction with ESRD.

23.     The Medicare program for ESRD is administered through the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS"). Medicare provides benefits for all patients with ESRD. Individuals who are otherwise ineligible for Medicare become eligible when they develop ESRD. Medicare has since been the primary payor for more than 80% of the cost of dialysis treatment for nearly 800,000 ESRD patients in the United States, and ESRD expenditures exceed as much as $40 billion annually.

24.     ESRD related services and supplies are paid to the ESRD facility through the ESRD prospective payment system. Other entities providing ESRD related services, including laboratories, suppliers, and physicians billing for ESRD related drugs must look to the ESRD facility for payment. There are two base composite rates: One for hospital-based ESRD facilities and a separate lower rate for independent facilities. Each of these base rates is composed of a labor and a non-labor portion. The facility's composite rate is a comprehensive payment for all modes of in-facility dialysis, hemofiltration, and home dialysis except for bad debts, physicians' patient care services, and certain laboratory services and drugs that are separately billable.

25.     At all times material hereto, the general coverage parameters for Government Payor programs, such as Medicare and Medicaid, condition both participation and payment under the

program upon compliance with certain laws intended to ensure the integrity of the program, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

26. At all times material hereto, the submission of claims to Government Payor programs, such as Medicare and Medicaid, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, are ineligible for payment.

27. At all times material hereto, the submission of claims to Government Payor programs, such as Medicare and Medicaid, which were ineligible for payment because of violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, also constitute violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., because the payments of those claims were made with funds from Government Payor programs, such as Medicare and Medicaid.

28. Therefore, any claim that violates the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, is also a false or fraudulent claim under the False Claims Act, 31 U.S.C. § 3729, *et seq*.

29. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) arose out of Congressional desire to protect patients and federal healthcare programs, including Medicare, due to the concern that providing things of value to those who can influence health care decisions may corrupt professional judgment and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS prohibits the payment of kickbacks to protect the integrity of federal healthcare programs. *See* Social Security Amendment of 1972, Pub. L. No 92-603, §§ 242(b) and (c), 42 U.S.C. § 1320a-7b, Medicare- Medicaid Antifraud and Abuse Amendments, Pub. L. No 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

30. In relevant part, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, makes it a crime "to offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or

indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program" 42 U.S.C. § 1320a-7b(b)(2)(A).

31.     In relevant part, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of Federal health care business, including the prohibition of the offer or payment of "anything of value" in return for referrals.

32.     In relevant part, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and therefore the False Claims Act, 31 U.S.C. § 3729, *et seq*., prohibits certain compensation arrangements if the purpose of the arrangement is to compensate physicians for past or future referrals of beneficiaries of Government Payor programs, such as Medicare or Medicaid.

33.     In relevant part, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and therefore the False Claims Act, 31 U.S.C. § 3729, *et seq*., prohibits providers like Defendants from entering into compensation arrangements with referral sources like hospitals or physicians that provide for free or below fair market value for services.

34.     On October 5, 2015, Plaintiff was hired by Defendants as the Director of Business Development, which later became known as Director of Strategy and Development, and Plaintiff remained in this position up until the date of his termination.

35.     During his employment, Plaintiff did not have a contract of employment, and in Tennessee, he was considered an employee-at-will, but Plaintiff could not be fired for an illegal reason or a reason that violated the public policies of the State of Tennessee.

36.     During his employment, Plaintiff worked out of his home office in Knoxville,

Tennessee, but was also required to travel approximately three to four times per month, and supervised expansion and growth for his region, by collaborating, coaching, and guiding two Regional Vice Presidents; two Directors of Home Therapies; two Directors of Inpatient Services; three Kidney Care Advocates; five Directors of Operations; and assisted in training other Directors of Business Development.

37.     During his employment, Plaintiff earned merit raises, bonuses, and awards.

38.     During his employment, Plaintiff consistently earned quarterly bonuses based on his performance.

39.     During his employment, Plaintiff performed his job duties in a competent and satisfactory manner.

40.     During his employment, Plaintiff was never written-up or disciplined for any reason.

41.     During his employment, Plaintiff consistently earned positive performance evaluations.

42.     The following chart fairly and accurately represents the Plaintiff's performance evaluations over the course of his employment, to-wit:

| Overall Rating | Review Period | Manager |
|---|---|---|
| "Not Rated" | 2017 | Charles "Doug" Williams |
| 2 – Superior | 2018 | Charles "Doug" Williams |
| 3 – Commendable | 2019 | Charles "Doug" Williams |
| 3 – Commendable | 2020 | Charles "Doug" Williams |
| 3 – Commendable | 2021 | Charles "Doug" Williams |
| N/A | 2022 | |

43.     During his employment, Plaintiff received multiple awards of his successful performance, including the President's Club in 2017-2018 which was the highest achievement award, and also the Highflyer Award Winner in 2021 which was "one of the highest honors" of

Defendants due to the company canceling the President's Club award due to Covid in 2021.

44.     In late 2019 and April 2021, by the vote of the Vice Presidents of Market Development, Plaintiff presented twice at the National Sales meeting to 50+ Directors of Market Development.

45.     In or around 2018-2022, at the request of the Vice President of Market Development, Doug Williams, and the Regional Vice President, Alice Shegog, Plaintiff also agreed to travel throughout the United States to train recently hired Directors regarding the highly important sales initiatives known as, "Growth and Gain Market Share."

46.     At the end of 2021, Plaintiff was ranked second in the United States in terms of Peer to Peer Performance, and was awarded the President's Club/"High-flyer" award.

47.     After Plaintiff was hired, up through the date of his termination, as hereinafter alleged, Plaintiff reported to and was supervised by the Vice President of Market Development, Doug Williams.

48.     As Vice President of Market Development, Doug Williams, was an agent and employee of the Defendant.

49.     As Vice President of Market Development, Doug Williams, had the authority to discipline and terminate Plaintiff.

50.     As Vice President of Market Development, Doug Williams reported to and was supervised by the Senior Vice President of Sales & Account Management, Tom Weider.

51.     As Senior Vice President of Sales & Account Management, Tom Weider was an agent and employee of the Defendant.

52.     As Senior Vice President of Sales & Account Management, Tom Weider had the authority to discipline and terminate Plaintiff.

53.     As Director of Strategy and Development, Plaintiff's primary responsibilities were to negotiate all contact patient agreements with various hospital systems to provide dialysis and related services that Defendants subcontracted in the hospitals, target real estate on behalf of the company to build new dialysis clinics, enter into joint ventures with hospitals and/or physicians, run and review business analytics, conduct quarterly joint venture meetings with physician practices and hospitals, review back office data analytics as a consultant for managed care initiates, host dinner / lunch meetings with physician groups and direct regional team on overall strategies to achieve annual growth / EBITDA goals set by the company.

54.     After Plaintiff was originally hired up until on or around April 26, 2022, Plaintiff's assigned territory was the Mid-Atlantic Group, which consisted of most parts of Tennessee and Kentucky, southern Indiana, southern Illinois, as well as portions of West Virginia and Virginia.

55.     At all times material hereto, the Plaintiff's assigned regional office for the east Tennessee region was based out of Knoxville, TN, and this office covered the territories assigned to Plaintiff.

56.     On or around April 26, 2022, Plaintiff's assigned territory was changed specifically to only cover east Tennessee, West Virginia, and southwest Virginia, in order to turnaround the Defendants' struggling and poor performance in West Virginia and Virginia, and to help Defendants' operations throughout West Virginia become profitable, but Plaintiff still worked out of his home office in Knoxville, TN.

57.     As of April 2022, Plaintiff's supervisor, Doug Williams, lived in West Virginia, and had been the Vice President of Market Development over West Virginia, among other states, for over 15 years.

58.     As a result, as of April 2022, the Vice President of Market Development, Doug

Williams, was very familiar with the hospital systems and other healthcare providers throughout West Virginia.

59.     Shortly after Plaintiff began working in West Virginia, he discovered numerous issues that implicated and/or directly violated the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, including those issues hereinafter alleged.

**Medical Director Agreements**

60.     At all times material hereto, Defendants enter into Medical Director agreements with physicians to run the dialysis clinics for the treatment of patients, and these agreements are supposed to be based on the fair-market-value of the compensation paid to physicians in similar markets.

61.     At all times material hereto, including in 2022, all outpatient dialysis clinics, such as those operated by Defendants in West Virginia, must have a qualified medical director "to be responsible for the delivery of patient care and outcomes in the facility." 42 C.F.R. § 494.150.

62.     At all times material hereto, compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, requires Defendants' agreements with providers, such as the Medical Director agreements, to reflect the fair market value for services actually rendered.

63.     At all times material hereto, including throughout Plaintiff's employment, Defendants claimed to abide by a strict "policy" consistent with the industry standard of allowing a maximum of only two dialysis units per physician pursuant to the Medical Director arrangements for all locations throughout the United States because the physician is responsible for overseeing all quality of care provided to patients of those clinics which requires close supervision, although Defendants' corporate office would from time-to-time allow an "exemption" to oversee a third unit given the circumstances and the physician promise to hire an additional physician within a

specified timeframe.

64.     However, in mid-2021, Plaintiff discovered that Defendants' Medical Director agreements with physicians in West Virginia substantially overpaid above the fair market value, as much as $750,000 per year to one physician which equated to about $150,000 to $175,000 per dialysis unit, and these physicians were in a position to influence referrals of patients from hospitals to Defendants' clinics.

65.     Around that same timeframe, in mid-2021, Plaintiff also discovered that Defendants had multiple Medical Director agreements in West Virginia that allowed one physician to oversee four-to-six different dialysis units in violation of Defendants' own "policy" and, in fact, these units were often spread geographically throughout West Virginia which would make it extremely difficult, if not impossible, for one physician to oversee the quality of care at each of the clinics.

66.     In comparison, for example, Defendants' Medical Director agreements with physicians in Tennessee, Kentucky, and Indiana typically paid around $50,000 to $90,000 per dialysis unit, and those physicians were allowed to oversee only two dialysis units in total pursuant to Defendants' alleged "policy."

67.     For years during Plaintiff's employment, including in 2022, Defendants overpaid physicians in West Virginia exorbitant fees pursuant to Medical Director agreements for overseeing Defendants' dialysis clinics, and this arrangement resulted in Defendants paying more than double of what it pays in similar or larger markets, allowing the physicians to "oversee" the quality for as many as four-to-six different dialysis clinics, and some of the physicians are paid these fees when they are not even responsible for covering hospitals.

68.     In 2022, and years prior, pursuant to these Medical Director agreements,

Defendants overpaid physicians in West Virginia nearly ten times more than what physicians in similar and/or larger markets were earning, such as compared to Knoxville, TN.

69.     Since at least 2014, forward, Defendants have five-to-six different Medical Director arrangements with Ali Ahman Suleiman, M.D., that is lumped into one agreement to compensate him $150,000 per unit (for a total of $750,000), to oversee Defendants' dialysis clinics located across West Virginia. This arrangement also includes for Dr. Suleiman to cover the VA Medical Center (Beckley / Charleston) hospital, but he was rarely in the hospital to sign off on the quality of care. This was the same arrangement for Dr. Mohamed Sekkarie /Dr. Ahmed Etter in Bluefield and Princeton Community Hospital in West Virginia.

70.     As of 2022, Ali Ahman Suleiman, M.D., was very close with the previous Regional Vice President, Sharon Deluca, who was also promoted to Group Vice President in 2021.

71.     In the fall or winter of 2020, the Group Vice President, Sharon Deluca, and Vice President of Market Development, Doug Williams, renewed Dr. Ali Ahman Suleiman's Medical Director agreements knowing that Dr. Suleiman was not covering his hospitals and also knowing that Dr. Suleiman had some of the worst quality of care metrics in the country.

72.     Prior to renewing Dr. Suleiman's Medical Director agreements as set forth in the above Paragraph, Plaintiff and Vice President of Market Development, Doug Williams, met with Dr. Ali Ahman Suleiman regarding the excessive fees that he was being paid in connection with the Medical Director agreements to advise Dr. Suleiman that Defendants would not be renewing his agreements at the same high rate of pay. In response, however, Dr. Suleiman got very angry and upset, as he advised Williams and Plaintiff that he "needed to be able to buy a jet" and this confrontation got to the point that Dr. Suleiman abruptly ended the meeting.

73.     Unbeknownst to Plaintiff, however, Vice President of Market Development, Doug

Williams, thereafter gave in to Dr. Suleiman's demands and agreed to renew the various Medical Director agreements with Dr. Suleiman, thereby paying him the excessive rates for overseeing multiple clinics.

74.     Since at least 2020, forward, Defendants have four different Medical Director agreements with James J. Demarco, M.D., to oversee Defendant' dialysis clinics located around Clarksburg, West Virginia.

75.     Since at least 2020, forward, Defendants have four different Medical Director agreements with Abdul Rahman Zanabli, M.D., to oversee Defendant' dialysis clinics located around Charleston, West Virginia.

76.     As a result of the above, the Plaintiff began questioning the Defendants' Medical Director agreements with physicians in West Virginia, including by discussing his concerns directly Doug Williams, Sharon Deluca, and with the Plaintiff's previous counterpart, Alise Shegog, who was also brought in to help clean up the West Virginia market with Plaintiff. During these conversations, Plaintiff questioned the various Medical Director agreements, including the amounts and 5-year extension timelines, extreme lack of quality being provided to patients, much higher than normal mortality rates, below acceptable staffing within the clinics and lack of placement for additional nephrologists employed by Defendants, but Plaintiff's concerns were ignored and the fraudulent conduct continued through the date of Plaintiff's termination, as hereinafter alleged.

**Charging for Services at Substantially Below Fair Market Value and/or at No-Cost**

77.     After Plaintiff was initially assigned to work in West Virginia in late 2021, and thereafter when he was assigned all of West Virginia in April 2022, Plaintiff discovered and then further confirmed that some of Defendants' agreements with the majority, if not all, of the hospital

systems throughout West Virginia for inpatient dialysis services (known as "inpatient service agreements") were billing the hospitals substantially below fair market value and/or at no cost that, in turn, allowed Defendants to benefit long-term because these providers referred patients to Defendants and then allowed Defendants to keep those patients on its dialysis services for as long as possible.

78.     In or around late-2021, Plaintiff complained to his supervisor, Vice President of Market Development, Doug Williams, that he had discovered over eight hospitals that were costing Defendants substantial revenue and that Defendants were "basically giving away services for free" by providing dialysis services significantly below fair market value and that "this looks like an inducement to drive referrals," *i.e.*, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and but Plaintiff's initial complaints were ignored.

79.     By way of background, over the last few decades, Defendants and/or the predecessor companies were previously the subject of multiple cases alleging violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and/or the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, due to providing kickbacks to induce patient referrals, such as, by charging below the fair market value for dialysis services for Medicare beneficiaries, and Defendants and/or its predecessor companies have paid millions of dollars in settlements and/or fines. As a result, Defendants superficially attempted to put an end to this long-standing fraudulent scheme by having the Directors of Strategy and Development, such as Plaintiff, renegotiate the agreements that did not charge the fair market value for services because said agreements fraudulently induced patient referrals. However, as explained below in more detail, the Defendants apparently did not take necessary steps to ensure that all of the agreements were appropriate because Defendants permitted

its Vice Presidents of Market Development, such as Doug Williams, to utilize their discretion to charge whatever amounts they desired to keep their contracts with the medical providers and, in turn, compete with competitors, such as DaVita, Inc., in this highly-competitive market.

80.     As Plaintiff persisted with his above complaints, Plaintiff attended a meeting in late-April 2022 with his supervisor, Vice President of Market Development, Doug Williams, and Hospital Administrator of the Charleston Area Medical Center, Glen Martin.

81.     As of late-April 2022, Vice President of Market Development, Doug Williams, and Hospital Administrator of Charleston Area Medical Center, Glen Martin, were friends socially and considered to be "golfing buddies."

82.     As of late-April 2022, Glen Martin was an agent and employee of Charleston Area Medical Center.

83.     As of late-April 2022, the Charleston Area Medical Center was Defendants' largest volume account in West Virginia.

84.     As of late-April 2022, Defendants were charging Charleston Area Medical Center's five hospitals only $290.00 per treatment for 2 patients-to-1 Registered Nurse treatment ratio, and only $325.00 per treatment for 1 patient-to-1 Registered Nurse treatment ratio.

85.     As of late-April 2022, Vice President of Market Development, Doug Williams, was aware of and/or knew that Defendants were charging Charleston Area Medical Center's five hospitals only $290.00 per treatment for 2 patients-to-1 Registered Nurse treatment ratio, and $325.00 per treatment for 1 patient-to-1 Registered Nurse treatment ratio.

86.     Prior to April 2022, Vice President of Market Development, Doug Williams, approved of Defendants charging Charleston Area Medical Center's five hospitals only $290.00 per treatment for 2 patients-to-1 Registered Nurse treatment ratio, and $325.00 per treatment for 1

patient-to-1 Registered Nurse treatment ratio.

87.     Prior to April 2022, Vice President of Market Development, Doug Williams, knew or should have known that Defendants were charging Charleston Area Medical Center's five hospitals substantially below the fair market value for dialysis and related services, including for the treatment ratios for 2 patients-to-1 Registered Nurse and 1 patient-to-1 Registered Nurse.

88.     As of the meeting in late-April 2022, Defendants' own Finance Department calculated the fair market value for the services provided at the Charleston Area Medical Center's five hospitals to be a fair market value of $575.00 for 2 patients-to-1 Registered Nurse treatment ratio, and a fair market value of $635.00 for 1 patient-to-1 Registered Nurse treatment ratio.

89.     As of the meeting in late-April 2022, Defendants own software system, "Corporate Finance Pricing Tools - showing allowable margins for approval based on executive title and Novatus," that prices the models of the fair market value for particular regions by the specific zip codes and cost centers based on staff salary cost for the market, further confirmed that the Charleston Area Medical Center's five hospitals, as well as the other providers in West Virginia, were being charged below the fair market value for dialysis and related services.

90.     As of late-April 2022, Vice President of Market Development, Doug Williams, was aware of and/or had knowledge that Defendants were charging the Charleston Area Medical Center's five hospitals at least $285.00 below fair market value for 2 patients-to-1 Registered Nurse treatment ratio, and at least $310.00 below fair market value for 1 patient-to-1 Registered Nurse treatment ratio in order to induce patient referrals from this major hospital system.

91.     After this meeting in late-April 2022, Plaintiff complained that Defendants were "buying referrals" from the Charleston Area Medical Center's five hospitals by charging substantially below fair market value for the dialysis and related services.

92.     In response to Plaintiff's complaints during this meeting in late-April 2022, Vice President of Market Development, Doug Williams, responded that the Charleston Area Medical Center was a "strategic account" and "we don't want to mess with this" in reference to charging fair market value. Plaintiff asked what was so "strategic" about this account and noted in his complaints that he was "held accountable for legal incompliance" to renegotiate this contract with Charleston Area Medical Center, but Plaintiff's complaints were ignored.

93.     Plaintiff's above-reference to the "legal incompliance" is because Defendants charging substantially below fair market value to induce patient referrals from the Charleston Area Medical Center is in violation of federal law, including the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

94.     In fact, throughout 2021 and 2022, Plaintiff was required to obtain approval on the pricing agreements from Defendants' in-house counsel, and Plaintiff had multiple discussions with in-house counsel regarding the ongoing concerns about the West Virginia hospitals being charged substantially below fair market value for dialysis and related services.

95.     Further, about a year before this meeting in late-April 2022, in or around 2021, the Charleston Area Medical Center previously contracted with one of Defendants' primary competitors, DaVita, Inc., to provide the dialysis services across the five hospital locations, but DaVita lost its business with Charleston Area Medical Center after it attempted to renegotiate the rates of the contract.

96.     As a result, Vice President of Market Development, Doug Williams, approached Charleston Area Medical Center to negotiate a new deal and, as part of the arrangement, Defendants ultimately agreed to provide dialysis and related services substantially below the fair market value for those services.

97.     If Defendants entered into an agreement with Charleston Area Medical Center to provide dialysis and related services at a cost substantially below the fair market value in order to induce patient referrals, then that would be a violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

98.     Further, in or around April or May 2022, while they were both working in West Virginia, Doug Williams responded to Plaintiff's persistent complaints by mentioning that a Hospital Service Specialist, Roy (last name unknown), who was responsible for placing patients at clinics when they were discharged by the Charleston Area Medical Center, had recently informed Williams that he was "not going to steer patients" to Defendants because Williams had specifically asked Roy to send patient referrals to Defendants, which made Williams very upset and angry.

99.     From April 2022 up until the date of his termination, as hereinafter alleged, Plaintiff had numerous communications with his supervisor, Vice President of Market Development, Doug Williams, such as during various conference calls and in-person meetings, regarding Plaintiff's attempts to renegotiate contracts with providers throughout West Virginia that Defendants were charging below fair market value for dialysis and related services, and that, as a result, these providers were being induced to refer patients to Defendants, "giving incentives for referrals" and "buying referrals" of patients, including Medicare beneficiaries—including, for example, Charleston Area Medical Center, Thomas Memorial Hospital, St. Mary's Medical Center, LewisGale Hospital Montgomery, LewisGale Hospital Pulaski, and Greenbrier Valley Medical Center—but, in response, Williams would become defensive and dismissed Plaintiff's concerns, stonewalled and/or blocked Plaintiff from attempting to address the issues he had raised, repeatedly referred to these accounts as "strategic," and Williams further justified the below-fair-

market-value contracts by referencing the "number of patient referrals that would make up for losses," *i.e.*, in direct violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

100. For example, on August 4, 2022, Vice President of Market Development, Doug Williams, sent an email to the Plaintiff and to Director of Inpatient Services in Tennessee and West Virginia, Brigetta Nickel, advising that he spoke with Glen Martin, who was the Hospital Administrator of the Charleston Area Medical Center, advising that Martin preferred to have a "separate agreement" for the Pediatric program because Martin did not want to "raise rates" in the master agreement that Defendants had with Charleston Area Medical Center, and, Williams further stated that he thought that Charleston Area Medical Center "could be a strategic partner moving forward give their partnership with a large Nephrology practice." Shortly thereafter, Plaintiff responded to Williams' email confirming they would "look into a separate agreement just for Pediatrics" and that he would "speak with Brigetta [Lynn] and legal to see how we can find a work around." (*See* Williams-Plaintiff emails, dated August 4, 2022, attached hereto as Exhibit 1).

101. Later that same day, August 4, 2022, Lynn replied to Plaintiff's email advising that the "rates are so low it is still negative" so that Defendants weren't able to offer the Pediatrics program a separate agreement to the Charleston Area Medical Center. (*See* Exhibit 1).

102. Hospital Administrator of the Charleston Area Medical Center, Glen Martin, did not want to "raise rates" as referenced in Doug Williams' email of August 4, 2022 (at Exh. 1) because Charleston Area Medical Center specifically agreed to contract with Defendants, thereby referring patients to receive Defendants' dialysis services, because Williams agreed to provide said services at substantially below the fair market value.

103. Further, on more than one occasion in 2022 before Plaintiff's termination, after he

complained to and/or about his supervisor, Doug Williams, being involved in the Defendants charging providers well-below fair market value for dialysis and related services, which is a violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Williams subsequently confronted Plaintiff about his complaints, that Williams "knows everything that goes on in this company," and accused Plaintiff of "talking behind my [Williams'] back," and he otherwise threatened and tried to intimidate Plaintiff, including by threatening that "you need to keep your mouth shut," "I hear everything, you're only hurting your career," and "this is why you're not promotable to Senior Director [position]."

104.    In or around April or May 2022, as Plaintiff was discussing his concerns about Defendants charging providers well-below the fair market value for dialysis and related services with his supervisor, Doug Williams, Williams referenced a *qui tam* lawsuit that had been filed against the Defendants pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, by a former employee of the Defendants alleging essentially the exact same conduct that Plaintiff was actively complaining about and attempting to stop in West Virginia. During this conversation, Williams became visibly upset and angry that the former employee had filed the *qui tam* case raising those allegations making it clear to Plaintiff that he was to stop raising those same concerns alleged in the *qui tam* case.

105.    Plaintiff subsequently discovered that Williams could have been referring to any of the following *qui tam* cases that are and/or have been filed against the Defendants because each of these cases involved Defendants inducing patient referrals from other medical providers in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, to-wit:

• *United States of America ex rel. Martin Flanagan v. Fresenius Medical Care Holdings, Inc.,*

*d/b/a Fresenius Medical Care North America*, Civ. No. 1:21-cv-11627 (D. Mass. 2021) and Civ. No. 1:14-cv-00665 (D. Md. 2014) (alleging, among other conduct, violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b due to defendants entering into fraudulent agreements to provide dialysis services below (or no) cost to induce dialysis patient referrals and also providing improper remuneration via medical director agreements); and

- *United States of America ex rel. CKD Project, LLC v. Fresenius Medical Care AG&CO KGaA, Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America, New York Dialysis Services, Inc., FMS New York Services, LLC, Bio-Medical Applications Management Company, Inc.*, Civ. No. 1:14-cv-06646 (E.D. N.Y. 2014) (alleging, among other conduct, violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b due to defendants entering into fraudulent agreements to induce dialysis patient referrals).[1]

106.    At all times material hereto, charging medical providers well-below the fair market value for dialysis and related services in order to induce those providers to refer patients, including Medicare beneficiaries, is a violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

107.    At all times material hereto, complaining about Defendants charging medical providers well-below the fair market value for dialysis and related services in order to induce those providers to refer patients to Defendants, including Medicare beneficiaries, is a "protected activity" within the meaning of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

108.    At all times material hereto, attempting to stop Defendants from charging medical providers well-below the fair market value for dialysis and related services in order to induce those

---

[1] *See also United States of America ex rel. John Pepe M.D., and Richard Sherman, M.D. v. Fresenius Vascular Care, Inc. d/b/a Azura Vascular Care, American Access Care Physician, PLLC, and Gregg Miller, M.D.*, Civ. No. 1:14-cv-3505 (E.D. N.Y. 2014) (alleging vascular interventions were unreasonably and unnecessarily performed on patients with End Stage Renal Disease from 2012 through 2018).

providers to refer patients to Defendants, including Medicare beneficiaries, is a "protected activity" within the meaning of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

109. Thereafter, in July 2022, the entire sales team, including Plaintiff and his counterparts, and the Hospital Placement Service Managers, were instructed to join a call with Doug Williams' boss, the Senior Vice President of Sales & Account Management, Tom Weider, who advised that "everyone was in jeopardy of losing their jobs," and that all of the Vice Presidents, Williams, and Weider "are going to look" for reasons to fire people who have not "bought in" on holding in-person calls and meetings with physicians. When Plaintiff asked why, Williams responded, "We're coming out of COVID and expect everyone to do more with less to help keep the company profitable." Williams and Weider also advised that they were going to be looking at receipts, travel, number of physician calls, and so forth, to make sure employees were pushing to make the company profitable. While this call was concerning, Plaintiff had no reason to believe that he would actually be fired because Defendants had no reason to fire him.

110. After Plaintiff raised his initial concerns about Charleston Area Medical Center, his supervisor, Vice President of Market Development, Doug Williams, claimed that he would take action and "renegotiate" with the other hospitals that were being charged below fair market value for Defendants' services, but this was a lie.

111. For example, in or around 2021, Vice President of Market Development, Doug Williams, claimed that he had recently "renegotiated" contracts with several hospitals in West Virginia, including Cabell-Huntington Hospital, Mongolia General Hospital, and J.W. Ruby Memorial Hospital, among others, to reflect that Defendants were charging the actual fair market value for services.

112. However, the Plaintiff later discovered in mid-2022, Vice President of Market

Development, Doug Williams, was not truthful about "renegotiating" with the above-referenced hospitals, among others, to reflect fair market value because Defendants' own records continued to reflect a negative Earnings Before Interest and Taxes ("EBIT") report for each of these hospitals due to Defendants charging below fair market value.

113.     As a result, throughout 2022 up until Plaintiff's termination as hereinafter alleged, Plaintiff continued to raise complaints to Vice President of Market Development, Doug Williams, as well as with other management in corporate, such as Vice President of Inpatient Services in the corporate office, Mike Trento, but management in the corporate office only instructed for Plaintiff to "correct" the contracts with the hospitals throughout West Virginia and "provide updates on attempted second renegotiations" but Plaintiff was obfuscated, delayed, and stonewalled from entering into a second round of negotiations by those involved in this fraudulent scheme to induce patient referrals, including by his own supervisor, Williams, until eventually Plaintiff was wrongfully terminated, as hereinafter alleged.

114.     In furtherance of his complaints and attempts to stop the violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Plaintiff was able to successfully renegotiate fair market value for services with some of the smaller hospitals, such as LewisGale Montgomery, LewisGale Pulaski, and Greenbrier Valley Medical, shortly after he had taken over parts of West Virginia in late-2021 and into mid-2022, but this was primarily because his supervisor, Doug Williams, did not care if contracts with these hospitals were corrected due to these hospitals being smaller and low volume.

115.     In addition to dialysis services, the Plaintiff also discovered that Defendants were charging hospitals in West Virginia substantially below fair market value for other services, such as for the treatment, Aphaeresis.

116. In or around April or May 2022, Plaintiff discovered Defendants were running Aphaeresis treatments on patients of Charleston Area Medical Center's Women & Children's Hospital without any agreement or pricing in place.

117. In 2022, the fair market value cost for 1 patient-to-1 Registered Nurse Aphaeresis treatment was supposed to be $1,200.00 to $1,500.00 per treatment.

118. However, in 2022, and in the years prior on information and belief, Defendants were providing either for free or below fair market value Aphaeresis treatments to the patients referred from Charleston Area Medical Center's Women & Children's Hospital.

119. As a result, during multiple conference calls in July and August 2022, Plaintiff reported to Defendants' corporate office, including with the Vice President of Inpatient Services, Mike Trento, that Defendants could no longer run Aphaeresis treatments at Charleston Area Medical Center's Women & Children's Hospital until there was an agreement in place with new pricing to reflect the actual fair market value of these services.

120. In another attempt to stop Defendants from charging Charleston Area Medical Center substantially below fair market value for dialysis services, on September 1, 2022, Plaintiff emailed Vice President of Market Development, Doug Williams, the E. TN Regional Vice President, Robert Hayden, and Financial Analyst II, Victor Solorzano, and Director of Inpatient Services in Tennessee and West Virginia, Brigetta Nickel, to propose the new fair market value prices for the services provided at the Charleston Area Medical Center, wherein Plaintiff provided a comparison of the "current" rates that were below fair market value, with the "proposed" pricing rates that were fair market value, and then further stated therewith: "From a market perspective these rates look reasonable but with their current rates being so low it'll be a huge increase." (Plaintiff email dated September 1, 2022, attached hereto as Exhibit 2).

121.     However, Plaintiff's supervisor, Vice President of Market Development, Doug Williams, continued to ignore the Plaintiff and otherwise refused to take action to address Plaintiff's complaints.

122.     On September 12, 2022, while Plaintiff was working out of his home office in Knoxville, TN, Plaintiff received a call from his supervisor, Vice President of Market Development, Doug Williams, and was abruptly informed that he was being terminated, effective immediately, but he would be paid through September 23, 2022.

123.     During the termination call on September 12, 2022, Vice President of Market Development, Doug Williams, claimed that Plaintiff was fired for two trumped-up reasons: (1) for "falsifying" his call log by claiming he had at least four in-person sales calls on August 21, 2022 when he only had three, and (2) for not listing all of the "personal miles" that were driven by Plaintiff's wife in his company car.

124.     In response, during the termination call on September 12, 2022, Plaintiff complained about the trumped-up nature of these reasons for termination.

125.     By way of background, in early July 2022, Doug Williams' supervisor, Senior Vice President of Sales & Account Management, Tom Weider, stated over a sales call with the other Directors that there was a "new requirement" that "everyone has to make 6 in-person sales calls a day" which would have been an extremely difficult, if not impossible, "requirement" for the Directors in addition to their numerous other responsibilities, especially those Directors working in the more rural areas, such as West Virginia.

126.     As a result, the Directors, including Plaintiff, complained on multiple occasions to both supervisors, Doug Williams and Tom Weider, about this "requirement" for in-person sales calls being completely unrealistic and setting up employees to fail.

127.    In response to the Directors' complaints, Tom Weider eventually reneged by stating, "It is up to your boss [how many in-person sales calls are required], but we just need you in the field."

128.    Later, in or around late-July or early-August 2022, Vice President of Market Development, Doug Williams, informed his subordinates, including Plaintiff, that they were required to have a "minimum" of four in-person sales calls per day.

129.    In reality, however, the Vice President of Market Development, Doug Williams' requirement to have a minimum of four in-person calls per day was arbitrary and not equally enforced against the other Directors, including those other Directors who reported directly to Williams.

130.    Prior to Plaintiff's termination, Defendants never had a written policy requiring employees to hold a certain number of daily in-person sales calls.

131.    Prior to Plaintiff's termination, the "requirement" to hold a certain number of in-person daily calls was not listed or included anywhere in Plaintiff's job description as Director of Strategy and Development.

132.    On Sunday, August 21, 2022, Plaintiff took time out of his own schedule to drive to West Virginia to meet with his supervisor, Vice President of Market Development, Doug Williams, and also a hospital and two physicians on the following day, August 22, 2023.

133.    On or before August 22, 2022, Vice President of Market Development, Doug Williams, was aware of and/or knew that he and Plaintiff were meeting with the hospital and two physicians on August 22, 2023.

134.    On or before August 22, 2022, Vice President of Market Development, Doug Williams, approved of him and Plaintiff meeting with the hospital and two physicians on August

22, 2023.

135.     On August 21, 2022, Plaintiff drove more than 400 miles for the three in-person sales calls in West Virginia that he attended with his supervisor, Vice President of Market Development, Doug Williams.

136.     Further, on August 22, 2022, with his supervisor, Doug Williams, traveling with him in the car, Plaintiff called and spoke with three additional providers to set up possible meetings, but the providers could not meet in-person that day.

137.     Immediately thereafter, on August 22, 2022, Vice President of Market Development, Doug Williams, told Plaintiff that he "still needed to get your six calls" per Defendants' unwritten policy to have six in-person sales calls per day—although Williams previously agreed that the "minimum" was only four in-person calls—and Williams instructed Plaintiff to log all of his in-person and telephonic sales calls for August 22 into Defendants' internal recordkeeping in order to "stay off of Tom's [Weider] radar."

138.     As a result, Plaintiff did as his supervisor, Doug Williams, instructed by logging all of his calls, in-person and telephonic, into Defendants' internal recordkeeping, known as "Sales Force – Veeva" for his daily log of August 22, 2022.

139.     Vice President of Market Development, Doug Williams, was aware of and/or knew that Plaintiff had the three in-person sales calls on August 22, 2022, because he rode with Plaintiff that day and attended the calls with Plaintiff.

140.     On August 22, 2022, Vice President of Market Development, Doug Williams, never complained or took issue with the fact that Plaintiff only had a total of three in-person sales calls scheduled for that day.

141.     Vice President of Market Development, Doug Williams, was aware of and/or knew

that Plaintiff had three telephonic sales calls on August 22, 2022, because he was in the car with Plaintiff during said calls.

142. However, the following day, August 23, 2022, Doug Williams informed Plaintiff that he was being "audited" by corporate for not making six in-person sales calls on August 22, 2022, despite the fact that Plaintiff simply did what Williams instructed him to do by logging all of the calls for that day, but Williams set Plaintiff up and then did not support him in retaliation in order to have Plaintiff terminated.

143. In fact, on August 22, 2022, at 6:34 AM, Vice President of Market Development, Doug Williams, sent an email to his subordinate Directors, Plaintiff, Cindy Whisner, and Kurt Stone, stating in relevant part:

> Remember we talked about spending 4 days in the field and targeting 4 calls per day, which we all agreed seemed doable. I know there are times and reasons this might be lower, Ryan [Plaintiff] for example has a pretty spread out geographical area, I've been with him when we've only seen 3 customers, and it was a good day b/c of all the driving.
>
> This is what view the Sr. Leadership team sees. If we are way off our target of 4 calls per day, there may be an issue with how we are recording the call, or another explanation. (Williams email dated August 22, 2022, attached hereto as Exhibit 3).

144. Similarly-situated employees engaged in the exact same, or much worse, conduct than Plaintiff, but these other employees were not disciplined or terminated, including but not limited to, the other Directors under Doug Williams, such as Kurt Stone and Cindy Whisner.

145. For example, according to Defendants' internal reporting, Cindy Whisner's daily in-person sales calls averaged to be 2.6 in July 2022 and 2.0 in August 2022.

146. However, Cindy Whisner was not disciplined or terminated for not making the six in-person per day sales calls pursuant to this unwritten policy and job requirement for the Directors.

147. As a result, during his termination call on September 12, 2022, Plaintiff complained

that every other employee in the country would be "guilty" of violating this same unwritten policy.

148.    Further, after Plaintiff's termination, Defendants internally changed the reporting for these sales calls by removing from the reports the option of making the calls telephonically and, therefore, all sales calls were deemed to be in-person, even when this was not true or accurate.

149.    As to the other alleged reason for Plaintiff's termination, on or about September 9, 2022, Plaintiff received an abrupt call from his supervisor, Doug Williams, who stated that Plaintiff "needed to talk to someone in HR" and then a female Human Resources employee stated that she needed to ask Plaintiff some questions about the corporate policy regarding company cars. The Human Resources employee, who was employed by NxStage which was another company acquired by Defendants, asked Plaintiff if he knew that he had "mis-logged" the number of personal miles that he had logged for the month of August 2022, based on the fact that Defendants had pulled Plaintiff's gas receipts and noticed that his company car had been filled up with gas three times in one day due to Plaintiff's wife, who was an authorized driver of his company car, driving to Florida to drop off their children with their grandparents.

150.    During the call with Human Resources, on or about September 9, 2022, Plaintiff answered the questions honestly and to the best of his recollection.

151.    At all times material hereto, Plaintiff's wife was an authorized driver of his company vehicle.

152.    At all times material hereto, one of the fringe benefits that Defendants provided was to allow employees and/or their authorized driver(s) to drive an unlimited number of miles in company vehicles for personal reasons.

153.    As a result, throughout Plaintiff's employment whenever he filled out his monthly mileage logs, Plaintiff would typically enter the same or similar mileage for business and personal

usage, such as always logging approximately 400 personal miles and 2,500 business miles.

154.    Prior to on or about September 9, 2022, the Defendants never previously questioned or took issue with Plaintiff's monthly mileage reports.

155.    Vice President of Market Development, Doug Williams, made the decision and/or was involved in the decision-making process to terminate the Plaintiff.

156.    At all times material hereto, the Rules and Regulations of the Tennessee Department of Labor and Workforce Development, Separation Notices to be Furnished by the Employers, Chapter 0800-09-01-.02, states, in part:

**0800-09-01-.02 SEPARATION NOTICES TO BE FURNISHED BY THE EMPLOYERS.**

(1) Whenever a worker is separated from employment for an indefinite period or for an expected duration of seven (7) days or more, the worker's employer shall furnish to such worker a Separation Notice.

(a) The employer must supply the worker with a Separation Notice within twenty-four (24) hours after the worker's separation from employment.

(b) The employer must use the Separation Notice supplied by the Department and the employer must complete the information required on the form.

157.    After Plaintiff's termination up to the date of this filing, Defendants never provided Plaintiff with the Separation Notice as required by Tennessee Rule and Regulation, Chapter 0800-09-01-.02(1).

158.    The real reason for Plaintiff's termination was because he refused to participate in Defendants' fraudulent and illegal activities, and/or activities that he had a good-faith belief violated the law.

159.    At all times material hereto, Defendants' conduct constitutes civil and criminal violations pursuant to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, False Claims Act, 31 U.S.C. § 3729, *et seq.*, 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims), and 18 U.S.C. §

287 (False, Fictitious, or Fraudulent Claims).

160.     Additionally, Defendants' conduct, as set forth herein, constitute violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, because the Defendants caused and/or caused other healthcare providers, to present false or fraudulent claims that were tainted by illegal kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, that were thereafter paid and/or approved by the Federal Government.

161.     The statutes set forth above were enacted to protect the public health, safety and welfare.

162.     The statutes set forth above reflect clear and unambiguous statements of public policy.

163.     Violations of the statutes set forth above can subject an employee to civil and/or criminal penalties.

164.     Plaintiff was terminated for his efforts to stop one or more violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and/or the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and, as such, constitutes a violation of the False Claims Act, 31 U.S.C. § 3730(h), and, therefore, Plaintiff sues for wrongful discharge pursuant to the statute.

165.     Plaintiff was terminated in retaliation for refusing to participate in or remain silent about violations of Tennessee and/or Federal law, and, as such, constitutes a violation of public policy and a violation of Tenn. Code Ann. § 50-1-304, and, therefore, Plaintiff sues for wrongful discharge under common law and pursuant to the statute.

166.     Defendants are responsible and liable for the retaliatory actions of its agents and employees under the doctrine of respondent superior and under agency principles.

167.     As a result of Defendants' illegal conduct, the Plaintiff has lost tangible job

benefits, including a loss of income and benefits, both past and future, and other pecuniary losses, including, but not limited to, the scholarships his children earned through Defendants' college scholarship program and a company vehicle, among other losses, and Plaintiff has further suffered, and will continue to suffer, emotional distress, humiliation and embarrassment, damage to reputation and character.

168.    The conduct of Defendants, as set forth herein, were intentional, malicious, fraudulent, or with reckless disregard to the Plaintiff's rights such as to justify the imposition of substantial punitive damages.

169.    This suit is timely filed.

**WHEREFORE**, the Plaintiff prays for judgement against the Defendants, and Plaintiff prays for the following relief:

1.    Compensatory damages, including front pay (or, in the alternative, reinstatement if the Court deems it appropriate);

2.    Two times the amount of backpay;

3.    Punitive damages;

4.    Prejudgment interest;

5.    Reasonable attorney's fees;

6.    Costs of this action;

7.    A jury to try this cause; and

8.    Appropriate injunctive relief ordering Defendants to cease and desist engaging in fraudulent practices.

RESPECTFULLY SUBMITTED, this the 12th day of September, 2023.

**THE BURKHALTER LAW FIRM, P.C.**

<u>s/David A. Burkhalter, II</u>
David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974