UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

RYAN M. ROWE,                          )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        No.:   3:23-CV-331-TAV-JEM
                                       )
FRESENIUS MANAGEMENT                   )
SERVICES, INC., FRESENIUS              )
MEDICAL CARE HOLDINGS, INC.,           )
D/B/A FRESENIUS MEDICAL CARE           )
NORTH AMERICA,                         )
                                       )
            Defendants.                )

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on defendants' motion to dismiss for failure to state a claim [Doc. 28]. Plaintiff has responded [Docs. 30, 31], defendant has replied [Doc. 32], and therefore, the motion is ripe for review. For the reasons set forth below, defendants' motion to dismiss [Doc. 28] is **DENIED**.

I.      **BACKGROUND**

The following facts are drawn from the amended complaint filed in this case [Doc. 24]. Defendants and their parent company, Fresenius Medical Care AG & CO. KGaA, provide dialysis services to patients with End-Stage Renal Disease ("ESRD") [*Id.* ¶¶ 18–20]. Given the highly competitive market of providing ESRD services, defendants, in addition to operating clinics throughout the country, enter into contracts with hospitals and other healthcare providers to provide dialysis treatment to their patients [*Id.* ¶ 20]. Defendants are providers and participants in federally funded health insurance programs

such as Medicare and Medicaid (hereinafter "Government Payors"), which pay for the costs of certain health care services and items on behalf of eligible beneficiaries based on age, disability, or affliction with ESRD [*Id.* ¶ 21]. Medicare provides benefits for all patients with ESRD and has been the primary payor for more than 80% of the cost of dialysis treatment for nearly 800,000 ESRD patients in the United States [*Id.* ¶ 22]. Most patients who receive defendants' dialysis and related services are beneficiaries of Government Payors [*Id.* ¶ 23].

### A. Anti-Kickback Statue and False Claims Act

Government Payor programs condition participation and payment under their programs upon compliance with certain laws, including 42 U.S.C. § 1320a-7b, the Anti-Kickback Statute ("AKS") [*Id.* ¶ 25]. In relevant part, the AKS makes it a crime to:

> offer[] or pay any remuneration (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program

[*Id.* ¶ 30 (citing 42 U.S.C. § 1320a-7b(b)(2)(A))]. The statute defines "remuneration" as "transfers of items or services for free or other than fair market value" [*Id.* (citing 42 U.S.C. § 1320a-7a(i)(6))]. Submission of claims to Government Payors that are in violation of the AKS are ineligible for payment [*Id.* ¶ 26]. Additionally, such violative claims also constitute violations under 31 U.S.C. § 3729, *et seq.*, the False Claims Act ("FCA"), because the payments of those claims are made with funds from Government Payor

2

programs [*Id.* ¶¶ 27–28]. Thus, any services resulting from a violation of the AKS also constitutes a false or fraudulent claim for purposes of the FCA [*Id.* ¶ 28].

## B. Plaintiff's Employment with Defendant

On October 15, 2015, plaintiff began working for defendants as the Director of Business Development, later retitled as Director of Strategy and Development [*Id.* ¶ 33]. During his employment, plaintiff primarily worked from home in Knoxville, Tennessee, but he would travel three to four times a month [*Id.* ¶ 34]. Plaintiff supervised expansion and growth for his assigned region [*Id.*]. Throughout his entire employment with defendants, plaintiff reported to and was supervised by Vice President of Market Development, Doug Williams, an agent and employee of defendants [*Id.* ¶¶ 45–46]. Williams was supervised by Senior Vice President of Sales & Account Management, Tom Weider, also an agent and employee of defendants [*Id.* ¶¶ 48–49]. Both Williams and Weider, in their respective positions, had the authority to discipline and terminate plaintiff [*Id.* ¶¶ 47, 50].

In his position, one of plaintiff's main responsibilities was to negotiate all contract patient agreements with various hospital systems for dialysis and related services that defendants provided [*Id.* ¶ 51]. When plaintiff was hired, his assigned territory consisted primarily of most of Tennessee, Kentucky, southern Indiana, southern Illinois, as well as portions of West Virginia [*Id.* ¶ 53]. However, on or around April 26, 2022, plaintiff's assigned territory was changed to cover only east Tennessee, West Virginia, and southwest Virginia [*Id.* ¶ 55]. Plaintiff was reassigned to this area to help turn around defendants'

3

struggling and poor performance in West Virginia and Virginia [*Id.*]. Williams, plaintiff's supervisor, lived in West Virginia, and had a special interest in the relationships with hospital systems and providers there [*Id.* ¶¶ 56–57].

During his employment, plaintiff earned merit raises, bonuses, and awards, and he consistently earned positive performance evaluations [*Id.* ¶¶ 35–41, 44].

## C.    Training

During plaintiff's new-hire training, defendants trained plaintiff on the FCA and the AKS [*Id.* ¶ 61]. Plaintiff alleges that the training included how defendants had previously been penalized by the federal government for "driving referrals" and/or "buying referrals" of patients by charging medical providers below fair-market-value ("FMV") for services in order to induce those providers to refer patients to defendants [*Id.* ¶¶ 61, 112]. This previous reprimand, plaintiff alleges, became the underlying reason for defendants' executive leadership to conduct further "training" during plaintiff's employment [*Id.* ¶ 60].

Specifically, plaintiff alleges that throughout his employment, executive leadership, including Williams and Weider, trained employees to be cautious and careful about discussing concerns of fraud or kickbacks, instructing employees to never use the phrases "buying referrals" or "driving referrals" in writing or emails [*Id.* ¶ 59]. Further, employees were instructed to visit physicians and hospital administrators in person to avoid putting anything in writing [*Id.*]. Employees were also instructed to never mention driving or buying referrals at these meetings [*Id.*]. Plaintiff alleges that these "trainings" occurred as needed, and whenever an employee "misspoke" by using a prohibited term, the employee

4

was verbally reprimanded and reminded of the "rules" [*Id.*]. Williams, in particular, reminded employees of the "rules," specifically because the company was already being reviewed by a third-party monitor, and there was fear of another audit [*Id.* ¶¶ 59–60]. Plaintiff states that, as a result of the trainings and threats, plaintiff and Williams discussed how the terms "driving referrals" and "buying referrals" increasingly became synonymous with "fraud" and "kickbacks" [*Id.* ¶ 62].

### D. The Initiative

Plaintiff alleges that from approximately 2017 to 2019, defendants implemented a large initiative to renegotiate all hospital contracts across the nation to show profitability [*Id.* ¶ 63]. Specifically, defendants pushed to increase the profit margins of these contracts as soon as possible, by charging FMV for the services, because the federal government was trying to "take money back" from defendants as a result of these kickbacks [*Id.*]. The initiative was motivated by the company being reviewed "for buying referrals" by the third-party federal government regulator [*Id.*]. However, as plaintiff later learned, this initiative was ignored with respect to the providers in West Virginia, "whereby [d]efendants allowed the hospital contracts to intentionally not be profitable—by charging those providers no-cost and/or substantially below [FMV] for [d]efendants' services—because this 'incentivized' the hospitals to continually refer patients to [d]efendants" [*Id.*]. Plaintiff states that these types of arrangements violated the FCA and the AKS [*Id.*].

5

Plaintiff claims that although he was tasked with renegotiating the contracts with West Virginia hospitals as a part of the defendants' initiative, plaintiff's power to do so was stripped by Williams, who denied renegotiation for any hospitals he deemed to be "strategic" [*Id.*]. Specifically, Williams refused to renegotiate these contracts because it was a "means to pick up business in other areas" due to defendants receiving substantial patient referrals from these sources [*Id.*]. Plaintiff claims that he complained and attempted to stop this fraudulent kickback scheme [*Id.*].

### E.    Medical Director Agreements for Outpatient Dialysis Clinics

Defendants would enter into Medical Director agreements ("MDAs") with physicians to run dialysis clinics, and these agreements were meant to be based on the FMV of compensation paid to physicians in similar markets [*Id.* ¶ 64]. Per 42 C.F.R. § 494.150, all outpatient dialysis clinics, including those operated by defendants in West Virginia, were required to have a medical director who was responsible for the delivery of patient care and outcomes in the facility [*Id.* ¶ 65]. In compliance with the AKS, defendants' agreement with providers, such as the MDAs, were required to reflect the FMV of services rendered [*Id.* ¶ 66]. Plaintiff alleges that defendants also claimed to abide by a strict policy, consistent with the industry standard, of allowing only a maximum of two dialysis units per physician under the MDAs [*Id.* ¶ 67].

Plaintiff claims that in mid-2021, while he was covering only portions of West Virginia in his role, he discovered that defendants' MDAs with physicians in West Virginia substantially overpaid the physicians, giving them above FMV for their services [*Id.* ¶ 68].

6

Further, plaintiff alleges that the overpaid physicians were seeing fewer patients compared to physicians in busier markets who were being paid less than half of what the physicians in West Virginia were being paid [*Id.* ¶¶ 68, 70–72]. Plaintiff asserts that these West Virginia physicians were also in a position to influence referrals of patients from hospitals to defendants' dialysis clinics [*Id.*].

Around the same time, plaintiff states that he also discovered that defendants had multiple MDAs in West Virginia that allowed a single physician to oversee four to six different clinics, in violation of defendants' own policy [*Id.* ¶ 69]. Plaintiff alleges that these clinics in West Virginia were often spread out, making it extremely difficult, if not impossible, for a single physician to oversee the quality of care at each of the clinics [*Id.*].

### 1.    Dr. Ali Ahman Suleiman

Plaintiff states that from at least 2014 forward, defendants have had five to six MDAs with Dr. Suleiman, which are lumped together as one agreement to compensate him $150,000 per unit, totaling $750,000, for overseeing defendants' dialysis clinics in West Virginia [*Id.* ¶ 73]. Plaintiff alleges that the arrangement included Dr. Suleiman's coverage of the VA Medical Center (Beckley/Charleston) hospital; however, Dr. Suleiman was rarely in that hospital to sign off on the quality of care [*Id.*]. Defendants had identical arrangements, plaintiff claims, with Dr. Mohamed Sekkarie and Dr. Ahmen Etter at the Bluefield and Princeton Community Hospital in West Virginia [*Id.*].

Plaintiff states that as of 2022, Dr. Suleiman was "very close" to defendants' prior Regional Vice President, Sharon Decula, who was promoted to Group Vice President in

2021 [*Id.* ¶ 74]. In late 2020, Decula and Williams met with Dr. Suleiman to discuss renewing his MDAs whilst knowing, plaintiff claims, that Dr. Suleiman was not covering his hospitals, and that Dr. Suleiman had some of the worst quality care metrics in the country [*Id.* ¶ 75]. Plaintiff alleges that in 2021, prior to renewing Dr. Suleiman's MDAs, he and Williams met with Dr. Suleiman to advise him that defendants would not be renewing his MDAs at the same high rate of pay [*Id.* ¶ 76]. Plaintiff states that Dr. Suleiman became very upset and angry during the meeting, ending it abruptly [*Id.*]. Shortly after the meeting, unbeknownst to plaintiff at the time, Williams gave in to Dr. Suleiman's demands, agreeing to renew the multiple MDAs with Dr. Suleiman and pay him the excessive rates for overseeing multiple clinics [*Id.* ¶ 77].

### 2. Physician Negotiations and Plaintiff's Concerns

Plaintiff alleges that multiple levels of defendants' executive leadership advised and threatened employees in Market Development, including plaintiff and Williams, that they were "never speak to physicians" about their MDA compensation as this "was a means for [defendants] to drive referrals" [*Id.* ¶ 78]. Executive leadership advised plaintiff that discussions with physicians should always be handled by leadership or "someone on the operational side of business" [*Id.*]. However, plaintiff claims that leading up to his termination in 2022, Williams made a point to handle the negotiations with the physicians in West Virginia regarding their MDAs, excluding plaintiff from these negotiations [*Id.*].

Plaintiff states that after discovering the excessive fees paid to Dr. Suleiman and other West Virginia physicians in late April of 2022, plaintiff began questioning the

defendants' MDAs with these physicians as he knew the agreements violated the FCA and AKS [*Id.* ¶¶ 79–82]. Plaintiff claims he discussed his concerns directly with Williams, Deluca, and plaintiff's previous counterpart, Alise Shegog [*Id.*]. During these conversations, plaintiff states that he raised concerns about the excessive compensation and five-year extension timelines that were being entered into with physicians as a means to drive patient referrals [*Id.*]. Plaintiff states that his concerns were ignored, and the fraudulent conduct continued through his termination [*Id.*].

### F. Charging for Services Below FMV and/or No Cost for Inpatient Services

In or around late 2021, plaintiff states that he complained to Williams that he had discovered over eight hospitals that were costing defendants significant revenue as defendants were "basically giving away services for free" by providing dialysis services at below FMV [*Id.* ¶ 84]. Plaintiff alleges he complained that this practice looked "like an inducement to drive referrals" in violation of the FCA and AKS [*Id.*]. Plaintiff contends his complaints were ignored [*Id.*].

Further, plaintiff states that after his assigned territory changed in 2022, he discovered and confirmed that defendants' agreements with the majority, if not all, of hospital systems throughout West Virginia for inpatient dialysis services were billing the hospitals substantially below FMV or at no cost at all [*Id.* ¶ 83]. Plaintiff alleges that this provided defendants with long-term benefits as these providers referred patients to defendants, and this allowed defendants to keep those patients on its dialysis services for

as long as possible and charge the hospitals for equipment, pharmaceuticals, and supplies related to ongoing care [*Id.*].

### 1. Contract with Charleston Area Medical Center

In fact, plaintiff claims that around late April 2022, he confirmed that defendants' market in West Virginia, under the supervision of Williams, did not actually renegotiate any of the hospital contracts per the previously described "initiative" [*Id.* ¶ 86]. Plaintiff states that when he complained about the West Virginia market "driving" and "buying" referrals, Williams falsely asserted that he would renegotiate with the hospitals that were being charged below FMV [*Id.* ¶¶ 87–88, 105–106]. As an example, plaintiff describes a meeting he attended with Williams and Glen Martin, the Hospital Administrator of the Charleston Area Medical Center ("CAMC"), for the purpose of renegotiating defendants' agreement with the medical center [*Id.* ¶ 88]. Plaintiff alleges that Williams and Martin were friends and considered to be "golfing buddies" [*Id.*]. And at this meeting, despite the meeting's purpose, Williams and Martin primarily discussed golf and made no efforts to renegotiate [*Id.*].

Plaintiff states that as of late April 2022, the CAMC was defendants' largest volume account in West Virginia, and approximately 90-95% of the revenue that defendants generated from this account was paid by federally funded Government Payor programs [*Id.* ¶¶ 90–91]. Plaintiff alleges that Williams was aware of, and had previously approved of, defendants charging the CAMC's five hospitals substantially below FMV for dialysis services [*Id.* ¶¶ 92-95]. Further, plaintiff alleges that as of late April 2022, defendants'

10

own finance department calculated the FMV for the services provided at the CAMC's five hospitals, and these values were far above what defendants were actually charging [*Id.* ¶¶ 96–97]. Plaintiff states that Williams was aware and/or had knowledge that defendants were charging the CAMC's hospitals below FMV to induce patient referrals from this major hospital system [*Id.* ¶ 98].

After the meeting with Williams and Martin, plaintiff states that he complained to Williams that defendants were "buying referrals" of patients from the CAMC's hospitals by charging substantially below FMV for dialysis and related services [*Id.* ¶ 99]. In response, Williams was dismissive, stating that the CAMC was a "strategic account" [*Id.* ¶ 100]. Plaintiff inquired as to what was so "strategic" about this account and noted in his complaint that he was held accountable for legal incompliance to encourage Williams to renegotiate the CAMC agreement [*Id.*]. Plaintiff states that throughout 2021 and 2022, he was required to obtain approval on the pricing agreements from defendants' in-house counsel, and plaintiff had discussions with in-house counsel regarding his ongoing concerns about the West Virginia market and his increasingly diminishing role in renegotiating contracts in that area [*Id.* ¶ 102].

On August 4, 2022, Williams sent plaintiff and Nickel an email advising that he spoke with Martin, and Martin preferred to have a "separate agreement" for the Pediatric program of the CAMC because Martin did not want to "raise rates" in the master agreement that defendants had with the CAMC [*Id.* ¶ 116]. Williams reiterated his mantra that the contract with the CAMC was "strategic" [*Id.*]. In response, plaintiff stated he would speak

11

to Nickel "and legal to see how we can find a work around" due to the unlikelihood of legal actually approving a separate agreement because Williams had otherwise refused to renegotiate the master agreement to reflect FMV of services provided [*Id.*]. Later that same day, Nickel replied to plaintiff's email, advising that the "rates are so low it is still negative[,]" so defendants were not able to offer the CAMC a separate Pediatric program agreement [*Id.* ¶ 117]. Plaintiff asserts that though the request for a separate agreement is not necessarily fraudulent, it is indicative of Williams's ongoing refusal to renegotiate fraudulent agreements, and providers requesting defendants not to "raise rates" [*Id.* ¶ 118].

In or around August 2022, plaintiff states that Williams mentioned to plaintiff that a Hospital Service Specialist, who was responsible for placing patients at clinics after they were discharged from the CAMC, "needed to drive referrals out of these hospitals and into [defendants'] clinics" [*Id.* ¶ 119]. However, the Specialist refused to steer referrals to defendants' clinic, which caused Williams to become angry [*Id.*].

On September 1, 2022, plaintiff states he again attempted to stop defendants from charging the CAMC below FMV for dialysis services by emailing Williams, Nickel, the E. TN Regional Vice President, Robert Hayden, and Financial Analyst II, Victor Solorzano, to propose the new FMV prices for services provided at the CAMC [*Id.* ¶ 125]. In this email, plaintiff provided a comparison of the "current" rates that were below FMV with the "proposed" pricing rates that were FMV, stating "[f]rom a market perspective these rates look reasonable[,] but with their current rates being so low[,] it'll be a huge increase" [*Id.*; Ex. 3]. After plaintiff sent this email, plaintiff claims Williams became angry and

12

instructed plaintiff to leave the CAMC accounts alone [*Id.* ¶ 126]. Plaintiff claims he told Williams he would not leave it alone [*Id.*].

### 2. Other Occasions of Complaints

Beginning around mid-2022 and up until plaintiff's termination, plaintiff became more vocal with his complaints, raising his concerns with Williams, his counterpart Brigetta Nickel, and other corporate management, such as Vice President of Inpatient Services, Mike Trento [*Id.* ¶ 107]. However, plaintiff alleges management only instructed plaintiff to "correct" the contracts and "provide updates on attempted renegotiations[,]" despite the fact that plaintiff was stonewalled from renegotiations by those involved in the fraudulent scheme, including Williams [*Id.*]. Plaintiff states that he communicated with Williams about plaintiff's attempts to renegotiate the illegal contracts, but again, Williams became defensive and dismissive, justifying the contracts due to the "number of patient referrals that would make up for losses" in direct violation of the FCA and AKS [*Id.* ¶ 108]. Williams also justified the fraudulent kickback arrangements in remarking that "West Virginians take care of each other" [*Id.*].

Plaintiff also alleges that around this time, when he raised complaints, Williams would reference a *qui tam* lawsuit that had been filed against defendants by a former employee pursuant to the FCA and AKS based the same conduct plaintiff was actively complaining about [*Id.* ¶ 110]. Plaintiff states that Williams would become visibly angry and upset when discussing the lawsuit, signaling to plaintiff that he was to stop making complaining about defendants charging providers below FMV for dialysis services [*Id.*].

13

Shortly thereafter, plaintiff states that he discovered multiple other *qui tam* lawsuits against defendants regarding the same claims [*Id.* ¶ 111].

Beginning in late 2021 and into mid-2022, plaintiff states that, in furtherance of his complaints and attempts to stop the FCA and AKS violations, he successfully renegotiated FMV for services in some smaller hospitals due to Williams's disinterest in low volume contracts [*Id.* ¶ 109]. Plaintiff states that this further proves the power that Williams had to limit and change plaintiff's job duties [*Id.*].

On another occasion in 2022, after plaintiff again complained to Williams about defendants' fraudulent kickback scheme, Williams confronted plaintiff, accusing plaintiff of talking behind his back, telling plaintiff to keep his mouth shut, and stating "this is why" plaintiff was not promotable [*Id.* ¶ 120].

Plaintiff also states that he discussed his concerns about the agreements in which West Virginia hospitals were being charged below FMV for defendants' services with his counterparts, Rich Lentz and Cindy Wentz, as well as Senior Director, Corey Anakee, at some point in time [*Id.* ¶ 52].

### G. Charging Below FMV for Other Services

Plaintiff also discovered, in or around April or May 2022, that defendants were charging hospitals below FMV for other services, such as for the treatment, Aphaeresis [*Id.* ¶¶ 121–23]. Additionally, defendants were running Aphaeresis treatments on patients of the CAMC's Women & Childrens Hospital without any agreement or pricing in place [*Id.* ¶ 121]. During multiple conference calls in July and August 2022, plaintiff reported to

14

defendants' corporate office, including Trento, that defendants could not longer run Aphaeresis treatments at CAMC's Women & Childrens Hospital until an agreement was in place with new pricing to reflect FMV for these services.

### H. Events Leading Up to Plaintiff's Termination

#### 1. In-Person Sales Calls Requirements

In July 2022, the entire sales team, including plaintiff, were instructed to join a call with Williams's boss, Weider, who advised that "everyone was in jeopardy of losing their jobs[,]" and that all of the Vice Presidents, including Williams and Weider, would be looking for reasons to fire those who have not "bought in" on holding in-person calls and meetings with physicians, as opposed to written communications [*Id.* ¶ 115]. When plaintiff inquired why, Williams stated that the company needed to remain profitable [*Id.*]. Williams and Weider advised that they would be looking at receipts, travel, and number of physician calls to make sure employees were pushing company profitability [*Id.*].

The same month, Weider, during a sales call with other Directors, stated that there was a new requirement that "everyone has to make 6 in-person sales calls a day[,]" which plaintiff states would be extremely difficult, if not impossible, to accomplish given Directors' other responsibilities and the rural areas in which some Directors worked [*Id.* ¶ 130]. Directors, including plaintiff, complained about this new requirement to Williams and Weider as being unrealistic and setting employees up to fail [*Id.* ¶ 131]. In response, Weider told plaintiff it was up to plaintiff's boss to decide how many in-person sales calls are required, but plaintiff was needed in the field [*Id.* ¶ 132].

15

In late July or early August 2022, Williams informed his subordinates, including plaintiff, that they were required to have a minimum of four in-person sales calls per day [*Id.* ¶ 133].  Plaintiff claims this requirement, however, was arbitrary and not equally enforced amongst other Directors, including those who reported to Williams [*Id.* ¶ 134].  In fact, defendants never had a written policy requiring employees to hold a certain number of daily in-person calls, nor was the "requirement" listed anywhere in plaintiff's job description [*Id.* ¶¶ 135–36].

On August 21, 2022, plaintiff drove to West Virginia to meet with Williams as well as a hospital and two physicians the following day [*Id.* ¶ 137].  Plaintiff alleges Williams was aware of and approved of plaintiff and him meeting with the hospital and physicians on August 22 [*Id.* ¶¶ 138–39].  On August 22, 2022, plaintiff and Williams made three in-person sales calls, and during their travel, plaintiff called three additional providers to set up possible meetings, but the providers could not meet in-person on the day plaintiff called [*Id.* ¶¶ 140–41].  Additionally, after meeting with a hospital and physicians associated with the CAMC, plaintiff again complained that defendants were charging the CAMC hospitals below FMV, and that the referrals were considered illegal kickbacks [*Id.* ¶ 142].  Again, Williams was dismissive, and he told plaintiff that he "still needed to get [his] six phone calls" per the new, unwritten requirement, although Williams previously agreed to a four-call requirement [*Id.* ¶¶ 142–43].  However, Williams instructed plaintiff to go ahead and log his in-person and telephonic sales calls into defendants' internal recordkeeping to stay off of Weider's radar, and Williams indicated that plaintiff's three in-person meetings and

16

three calls on August 22 was acceptable and not in violation of defendants' unwritten policy [*Id.* ¶¶ 143–46].

The next day, Williams informed plaintiff that he was being "audited" by corporate for not making six in-person sales calls the previous day, despite plaintiff following Williams's instruction [*Id.* ¶ 147]. Plaintiff claims Williams set him up for this audit [*Id.*]. In fact, plaintiff states that Williams had sent an email the morning of August 22 to plaintiff and two other members of the sales force team which confirmed Williams's four-call requirement and pointed out that plaintiff's call count might be lower at times because of plaintiff's assigned geographical spread [*Id.* ¶ 148; Ex. 2].

### 2.    Logging of Personal Miles on the Company Car

One of the fringe benefits that defendants provided was allowing employees and/or their authorized driver(s) to drive an unlimited number of miles in company vehicles for personal reasons [*Id.* ¶ 157]. Plaintiff's wife was an authorized driver of his company vehicle [*Id.* ¶ 156]. Through plaintiff's employment, plaintiff filled out his monthly mileage logs, and plaintiff would typically enter the same or similar mileage for business and personal usage, e.g., 400 personal miles and 2,500 business miles [*Id.* ¶ 158]. Plaintiff claims that defendants never took issue with how plaintiff filled out his logs [*Id.*].

On or about September 9, 2022, plaintiff states that he received a call from Williams, who stated that plaintiff needed to talk to someone in Human Resources ("HR") [*Id.* ¶ 154]. A HR employee informed plaintiff that she needed to ask plaintiff some questions about the corporate policy regarding company cars [*Id.*]. Then, the HR employee asked if the

plaintiff knew that he had "mis-logged" the number of personal miles that he had logged for August 2022 [*Id.*]. Plaintiff states this was based on defendants' pulling of plaintiff's gas receipts in which defendants noticed that plaintiff's company car had been filled up three times in one day due to plaintiff's wife driving to Florida [*Id.*]. Plaintiff states that during his call, he answered the questions honestly and to the best of his recollection [*Id.* ¶ 155]. Plaintiff states that defendants had never previously questioned or taken issue with plaintiff's monthly mileage report [*Id.* ¶ 159].

### I. Plaintiff's Termination

On September 12, 2022, Williams informed plaintiff that he was being terminated, effective immediately [*Id.* ¶ 127]. Williams stated that plaintiff was being fired (1) for "falsifying" his call log by claiming he had at least four in-person sales calls on August 22, 2022, when plaintiff only had three; and (2) for not listing all of the "personal miles" that were driven by plaintiff's wife in his company car [*Id.* ¶ 128]. During the termination call, plaintiff complained about the trumped-up nature of these reasons for termination [*Id.* ¶ 129].

Plaintiff states that similarly-situated employees engaged in the exact same, or much worse, conduct than plaintiff with respect to the in-person call requirement; however, none of these employees were disciplined or terminated [*Id.* ¶¶ 149–51]. Plaintiff states that he complained during his termination call that every other company employee would also be "guilty" of violating the unwritten, in-person sales call requirements [*Id.* ¶ 152]. Plaintiff also alleges that after his termination, defendants internally changed the reporting for the

18

sales calls by removing the option of making calls telephonically, and thus, all sales calls were deemed "in-person," even when they were made by phone [*Id.* ¶ 153].

Plaintiff claims that Williams made the decision and/or was involved in the decision to terminate the plaintiff [*Id.* ¶ 160]. Additionally, plaintiff asserts that the Rules and Regulations of the Tennessee Department of Labor and Workplace Development Chapter 0800-09-01-.02 require defendants to provide plaintiff with a Separation Notice, and plaintiff was not provided with such [*Id.* ¶¶ 161–62].

### J.     Plaintiff's Claims

In total, plaintiff states that defendants' conduct constitutes violations under the FCA and AKS, and defendants are responsible and liable for the retaliatory actions of its agents and employees under the doctrine of respondeat superior and agency principles [*Id.* ¶¶ 163–64]. Plaintiff claims that due to defendants' illegal conduct, he has lost tangible job benefits and other pecuniary losses as well as emotional distress and damage to his reputation and character [*Id.* ¶ 165]. Thus, plaintiff brings two claims: (1) the FCA, specifically 31 U.S.C. 3730(h); and (2) the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 [*Id.* ¶¶ 171–76].

## II.    STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a

19

cause of action.'"  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Furthermore, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that pleads facts "merely consistent with" liability, "stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Finally, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 663.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief."  *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008).  However, the Court need not accept legal conclusions or unwarranted factual inferences as true.  *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

A court may consider exhibits attached to the complaint when ruling on a motion to dismiss. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). However, if an exhibit contradicts the complaint, courts should disregard the allegations in the complaint in favor of the information in the exhibit. *Williams*, 498 F. App'x at 536.

## III.   ANALYSIS

### A.   False Claims Act – 31 U.S.C. § 3730(h)

The federal FCA is designed to prevent and punish multiple forms of fraud on the federal government by imposing civil and criminal penalties for such wrongs. *Univ. Health Servs., Inc. v. U.S.*, 579 U.S. 176, 181–82 (2016). Additionally, the FCA "protects employees who pursue, investigate, or otherwise contribute to an action exposing fraud against the government." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). Specifically, Section 3730(h)(1) of the FCA states:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

"Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 397–98 (6th Cir. 2015) (citing *Scott v. Metro. Health Corp.*, 234 F. App'x

21

341, 346 (6th Cir. 2007)). A plaintiff may establish a case of retaliation "by presenting either direct or circumstantial evidence of a retaliatory motive." *Id.* at 398 (citations omitted).

If a plaintiff proceeds with circumstantial evidence, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Id.* Specifically, under the *McDonnell-Douglas* framework, "the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation" first. *Id.* (citing *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013)). To demonstrate a *prima facie* case for a claim of retaliation under the FCA, a plaintiff must show: (1) he was engaged in a protected activity; (2) his employer knew that he was engaged in a protected activity; and (3) the employer retaliated against him as a result of the protected activity. *Id.* (citing *Yuhasz*, 341 F.3d at 566). "A § 3730(h) plaintiff need not plead or establish an actual violation of § 3729[,]" False Claims. *Fakorede v. Mid-South Heart Ctr., P.C.*, 182 F. Supp. 3d 841, 849 (W.D. Tenn. 2016) (citing *Jones-McNamara*, 630 F. App'x at 399).

### 1. Protected Activity

Plaintiff states that complaining about and attempting to stop defendants from charging medical providers well below FMV for dialysis and related services in order to induce providers to refer patients, including Medicare beneficiaries, is a "protected activity" within the meaning of the FCA [Doc. 24 ¶ 114]. For a plaintiff to show that he engaged in a protected activity under § 3730(h), the plaintiff must allege that he engaged in activities that "were in effort to stop one or more violations of the FCA." *Verble v.*

22

*Morgan Stanley Smith Barney, LLC*, 148 F. Supp. 3d 644, 657 (E.D. Tenn. 2015) (citing 31 U.S.C. § 3730(h)).  Specifically, an employee must have pursued "an effort to stop a *specific* violation (or potential violation) of the FCA of which he or she is aware."  *Id.* (emphasis in original) (quoting *Kem v. Bering Straits Info. Tech.*, No. 2:14-cv-263, 2014 WL 5448402, at *3 (S.D. Ohio Oct. 22, 2014)).  Further, a plaintiff "must have both a 'subjective, good-faith belief' and an 'objectively reasonable belief that fraud is being committed against the government.'"  *U.S. v. Cookeville Reg'l Med. Ctr. Auth.*, No. 2:15-CV-00065, 2021 WL 4594784, at *7 (M.D. Tenn. Oct. 6, 2021) (quoting *Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016)).

"Such protected activity includes reporting suspected misconduct to internal supervisors."  *Fakorede*, 183 F. Supp. 3d at 849 (citing *Tibor v. Mich. Orthopaedic Inst.*, 72 F. Supp. 3d 750, 761 (E.D. Mich. 2014)).  However, internal reports "must sufficiently allege . . . fraud against the United States government."  *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000).  "[M]erely urging compliance with regulations" is insufficient to constitute a protected activity.  *Id.*  Further, generalized complaints about wrongdoings "are not sufficient to serve as predicate acts for FCA retaliations."  *Cookeville Reg'l Med. Ctr. Auth.*, No. 2:15-cv-65, 2021 WL 4594784, at *7 (quoting *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1023 (S.D. Ohio 2014)).

Defendants state that plaintiff has failed to allege a protected activity, claiming that plaintiff's amended complaint does not allege that plaintiff "ever raised an alert about an

23

impact on the federal government, any potential false claims, or even actual unlawful referrals" [Doc. 29, p. 11]. Defendants contend that plaintiff has identified no facts suggesting that he was seeking to stop any specific FCA violation; rather, plaintiff relies on conclusory allegations that entire contractual relationships between defendants and hospitals or physicians violated the FCA [*Id.* at 12]. Furthermore, defendants argue that, contrary to the law, plaintiff attempts to treat theoretical AKS concerns as equivalent to FCA violations [*Id.* at 13].

Plaintiff counters, arguing that plaintiff reasonably believed, based on his training, that defendants were paying West Virginia providers "excessive Medical Director compensation and charging no-cost or below-cost for services . . . to induce the providers to refer Government Payor (Medicare) beneficiaries to defraud federally-funded health insurance" [Doc. 31, pp. 15, 17]. And this belief resulted in plaintiff complaining that defendants were "buying referrals" and "driving referrals" in violation of the AKS and FCA [*Id.*]. Plaintiff furthers argues that he did not need to repeatedly label the conduct of defendants as "FCA violations" or "federal government fraud" for his actions to constitute protected activity [*Id.*]. Additionally, plaintiff contends that defendants' arguments ignore the fact that "the vast majority of patients of the providers that Rowe complained about . . . were beneficiaries of Government Payor programs like Medicare" [*Id.*].

The Court finds that plaintiff has properly alleged that he engaged in a protected activity under 31 U.S.C. § 3730(h). First, plaintiff alleges facts to indicate that he had a subjective good faith belief, as well as an objectively reasonable belief, that fraud was

24

being committed against the government based on his employment training which focused on the AKS, the FCA, and defendants' past reprimands for violations of these statutes. Second, plaintiff alleged specific violations of the AKS and FCA, complaining about defendants' MDAs with Dr. Suleiman and other West Virginia physicians, raising concerns about the excessive compensation and five-year extension timelines being entered into with these physicians, and complaining that defendants were inducing referrals of patients from the CAMC's hospitals by charging substantially below FMV.

While defendants contend that plaintiff relies on mere inference to connect his complaints of AKS to fraud on the federal government, the Court finds that the amended complaint shows otherwise. In his amended complaint, plaintiff alleges that he complained to Williams "on multiple occasions about Williams' refusal to charge fair-market-value for the services Defendants were providing to patients of *federally funded Government Payor programs, including Medicare*, and that Williams was 'buying referrals' of patients" [Doc. 24 ¶ 126 (emphasis added)]. Based on this allegation, there is sufficient factual matter to show that plaintiff alleged fraud on the federal government in his complaints, and in turn, engaged in a protected activity. Additionally, plaintiff alleges that when making complaints, Williams would reference a *qui tam* lawsuit that had been filed against defendants by a former employee pursuant to the FCA and AKS based the same conduct plaintiff was actively complaining about [*Id.* ¶ 110]. Williams's explicit reference to the *qui tam* action in response to plaintiff's complaint leads the Court to reasonably infer that plaintiff alleged fraud on the federal government in his complaints.

25

Thus, construing the amended complaint in the light most favorable to the plaintiff, the Court finds there to be sufficient factual matter of plaintiff alleging fraud on the federal government, and in turn, engaging in a protected activity.

## 2. Notice of Protected Activity

To satisfy the notice element of a *prima facie* FCA retaliation claim, the plaintiff must allege "activities that would have given the defendant reason to believe that [he] was contemplating a *qui tam* action." *Merritt v. Mountain Laurel Chalets, Inc.*, 96 F. Supp. 3d 801, 823 (E.D. Tenn. 2015) (quoting *U.S. ex rel. Marlar v. BWXT Y–12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008)). Specifically, a plaintiff will satisfy this burden and survive a 12(b)(6) motion "where a plaintiff alleges that [he] observed purportedly fraudulent activity, [he] confronted [his] employer about it, and [his] employer fired [him] because of it." *Id.* (internal quotation marks omitted) (quoting *Marlar*, 525 F.3d at 449–50).

Regarding the notice element, defendants reiterate their position that there was no report of alleged fraud on the government, and in turn, there could have been no notice of such report for purposes of § 3720(h) [Doc. 29, pp. 16–17]. Additionally, defendants contend that plaintiff lodged his complaints with his immediate supervisor, the primary source of the alleged AKS and FCA violations, and plaintiff does not claim to have escalated his concerns to effectively "blow the whistle" [*Id.* at 17–18]. Lastly, defendants argue that plaintiff's allegations that he reported his concerns to co-workers and others in the company with unidentified roles "are too vague to plausibly allege the company was on notice of protected activity" [*Id.* at 18].

26

In response, plaintiff argues that he made multiple reports and complaints to defendants' employees, including his supervisor, Williams, and that he raised concerns with in-house counsel, managers in the corporate office, and his colleagues [Doc. 31, pp. 18–19].

The Court finds that plaintiff's allegations sufficiently plead the notice element of his retaliation claim. Plaintiff alleges that, on numerous occasions, he verbally complained and reported his concerns about fraudulent kickbacks to Williams and other employees including Nickel and Trento. And further, plaintiff alleges that he reported to managers in the corporate office of the company. These allegations are sufficient to overcome a 12(b)(6) motion. *See Zimmerman v. Elizabeth A. Pensler, D.O., PLLC*, No. 23-11634, 2024 WL 3881472, at *4 (E.D. Mich. Aug. 20, 2024) (finding the plaintiff satisfied the notice element of her retaliation claim as she had reported her concerns about fraudulent billing both verbally and via email to her supervisors); *U.S. v. Univ. of TN Med. Ctr. Home Care Srvs., LLC*, No. 3:17-CV-96, 2021 WL 3743189, at *14 (E.D. Tenn. Aug. 23, 2021) (finding the plaintiff plausibly alleged that the defendants were aware of her protected activity based on the plaintiff's reports and complaints to her Performance Improvement Coordinator and Branch Managers).

### 3. Employer Retaliation (Causation)

The final element of a FCA retaliation claim is causation—that the employer retaliated against plaintiff as a result of the protected activity. *Jones-McNamara*, 630 F. App'x at 398. To prove the final element, "the employee must show that the retaliation

27

was motivated, at least in part, by the employee's engaging in protected activity." *Lockheed Martin Corp.*, 14 F. Supp. 3d at 1021 (internal quotation marks omitted) (citing *McKenzie*, 219 F.3d at 514 n.4). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). However, when some time elapses between when the employer learns of the protected activity and the subsequent adverse employment action, "the employee must couple temporal proximity with evidence of retaliatory conduct to establish causality." *Id.* (citation omitted).

In their motion, defendants argue that plaintiff fails to allege causation "because he acknowledges non-retaliatory reasons for his termination" [Doc. 29, p. 19]. Additionally, defendants contend that plaintiff does not allege any statements directly linking his termination to his alleged complaints of fraudulent acts [*Id.*]. Lastly, defendants assert that much of the protected conduct plaintiff alleges is "temporally remote" from the alleged adverse employment action, and that plaintiff's attempts to allege protected conduct in the weeks before his termination do not save his claim [*Id.* at 19–20].

Plaintiff responds, stating that he complained of illegal activity on a continuing basis, "including less than a month before his termination" in which "Williams set him up to be fired" [Doc. 31, p. 21]. Specifically, plaintiff points to his complaints about the CAMC, which he lodged less than a month before his termination and cites to temporal

proximity [*Id.*].  Further, plaintiff denounces defendants' claim that plaintiff does not allege any statements directly linking his termination to protected conduct, stating this places a heavier burden on plaintiff than required at this stage of the proceedings [*Id.* at 22].  Finally, plaintiff asserts that defendants mischaracterize the reasons for plaintiff's termination, disregarding the facts explaining why these reasons are "trumped-up" [*Id.*].

The Court finds that the amended complaint alleges facts that sufficiently plead causation under a FCA retaliation claim.  First, although defendants contend that plaintiff's acknowledgement of non-retaliatory reasons for his termination indicates a failure to allege causation, the Court disagrees.  A plaintiff does not have to show that his termination was *solely* on the basis of retaliatory reasons.  *See Lockheed Martin Corp.*, 14 F. Supp. 3d at 1021 (citing *McKenzie*, 219 F.3d at 514 n.4).  Additionally, plaintiff alleges facts to support his claim that the provided reasons for his termination were "trumped-up[,]" or otherwise pretextual, and concocted as a cover for the retaliatory reason plaintiff was terminated [Doc. 24 ¶¶ 63, 128–59].  Finally, the temporal proximity between plaintiff's allegedly protected conduct, in which plaintiff complained on August 22, 2022, about defendants charging the CAMC's hospitals below FMV for services and that receiving patient referrals was considered a "kickback" [*Id.* ¶ 142], and plaintiff's termination on September 12, 2022, is sufficient to satisfy causation at this stage.  True, plaintiff engaged in protected conduct long before his termination as well, but this does not defeat an inference that defendants terminated plaintiff, at least in part, on his actions less than a month prior.  *See Hennessy*

29

*v. Mid-Michigan Ear*, No. 1:21-cv-301, 2023 WL 4676875, at *11 (W.D. Mich. July 21, 2023).

Accordingly, defendants' motion [Doc. 28] is **DENIED** as to plaintiff's FCA claim.

## B.      Tennessee Public Protection Act – Tenn. Code Ann. § 50-1-304

The TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). The TPPA was intended to provide "statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing[, and] essentially codified the common-law cause of action for retaliatory discharge[.]" *Williams v. City of Burns*, 465 S.W.3d 96, 109–10 (Tenn. 2015). For a plaintiff to maintain a TPPA claim, the plaintiff must show:

> (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; [and] (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Treadaway v. Big Red Powersports, LLC*, 611 F. Supp. 2d 768, 783 (E.D. Tenn. 2009) (quoting *Hubrig v. Lockheed Martin Energy Sys., Inc.*, No. 03A01-9711-CV-00525, 1998 WL 240128, at *7 (Tenn. Ct. App. May 4, 1998)).

### 1.      Refusal to Participate in or Remain Silent About Illegal Activities

Under the TPPA, illegal activities are "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3)(A). "An employee

30

can satisfy the second element of the TPPA "by showing that [he] had reasonable cause to believe that [his] employer had violated a law, regulation, or rule." *Wooley v. Madison Cnty.*, 209 F. Supp. 2d 836, 845 (W.D. Tenn. 2002) (citing *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997)). The plaintiff must also "establish that [he] reported the activity and that the reporting 'furthered a clear public policy.'" *Hicks v. Benton Cnty. Bd. of Educ.*, 222 F. Supp. 3d 613, 642 (W.D. Tenn. 2016) (quoting *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 38 (Tenn. 2015)); *accord Hall v. Wal-Mart Stores, Inc.*, No. 3:16-CV-2818, 2017 WL 2131649, at *3 (M.D. Tenn. May 16, 2017). Reporting the activity may serve a public purpose where it relates to potential insurance fraud, *Hall*, 2017 WL 2131649, at *3 (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537–38 (Tenn. 2002)); however, "[f]ailure to assert that defendant's alleged illegal activity implicated important public policy concerns may be grounds for dismissal of the complaint." *Id.* (citing *Hastings v. Remarketing Sols., Inc.*, 316 F. App'x. 488, 489–90 (6th Cir. 2009)).

Defendants argue that plaintiff cannot meet this element because (1) plaintiff has not shown that he reported the alleged wrongdoing to someone other than the person allegedly engaging in it; (2) plaintiff does not ever allege that he was asked to engage in an illegal activity, and thus, he cannot claim he "refused" to participate; (3) plaintiff's allegations do not support a reasonable belief that a law was violated, only a retrospective one; and (4) plaintiff has provided no allegations to show his concern to further the public good rather than his own interests [Doc. 29, pp. 20–24; Doc. 32, pp. 9–10].

In his response, plaintiff asserts that he reported his concerns to multiple high-level employees, such as Trento and in-house counsel, and not just Williams [Doc. 31, p. 23]. Further, plaintiff alleges that his refusal to stop his complaints despite consistent threats to "stop talking" and "leave it alone" is clear evidence of plaintiff being requested to go along with the fraud [*Id.* at 24].

There is no contention that violations of the AKS fit within the TPPA's definition of "illegal activities." While defendants assert that plaintiff did not have a reasonable belief that a law was being violated at the time of employer's wrongdoing and plaintiff's complaints and raised concerns, the Court disagrees. Plaintiff alleges that when he was hired with defendants, he underwent training which covered the AKS, the FCA, and these statutes in the context of defendants' prior federal government reprimands. This training, plaintiff alleges, provided plaintiff with the knowledge to have a reasonable belief that employer's actions regarding physician MDAs and hospital contract were illegal.

Based on the amended complaint, the Court also finds that plaintiff has, contrary to defendants' assertion, alleged facts sufficient to show that plaintiff complained about defendants' wrongdoing to those other than Williams. In fact, throughout his amended complaint, plaintiff points to various employees, Nickel, Trento, and Anakee, amongst others, with whom he discussed his concerns and complaints about defendants' allegedly illegal activities. Additionally, plaintiff alleges that he discussed concerns with in-house counsel as well as management at the defendants' corporate office. Furthermore, while defendants state that plaintiff cannot claim that he refused to participate in illegal activities,

the plaintiff need not allege both a refusal to participate and a refusal to remain silent under the TPPA. *See Treadaway*, 611 F. Supp. 2d at 783 (stating that the fourth element of a TPPA claim is "an exclusive causal relationship between the plaintiff's refusal to participate in *or* remain silent about illegal activities and the employer's termination of the employee" (emphasis added)). And in fact, the Court finds that plaintiff has sufficiently alleged that he refused to remain silent about defendants' wrongdoing, as the amended complaint is replete with references to plaintiff's continuous complaints of defendants' actions.

Lastly, as mentioned previously, defendants assert that plaintiff has provided no allegations to show his concern to further the public good. In his amended complaint, plaintiff states that the AKS and the FCA were "enacted to protect [] public health, safety, and welfare[,] and that these statutes "reflect clear and unambiguous statements of public policy" [Doc. 24 ¶¶ 15–16]. Based on these statements, coupled with plaintiff's allegations of defendants' illegal activities concerning AKS and FCA, the Court finds that plaintiff has sufficiently alleged the implication of important policy concerns in relation to defendants' conduct.

Accordingly, the Court finds that plaintiff has sufficiently alleged the second element of a TPPA claim.

## 2. Exclusive Causation

Under the last element of the TPPA, a plaintiff must establish that retaliation was the defendant's sole motivation for discharging him, and therefore, even if direct evidence

33

establishes that retaliation was a substantial motivating factor, that does not end the inquiry. *Williams*, 465 S.W.3d at 113 n.16. Tenn. Code Ann. 50-1-304(f) sets forth a statutory burden-shifting framework to be applied to TPPA claims. *Id.* at 112 n.15. This analytical framework is "virtually indistinguishable" from the *McDonnell Douglas* burden-shifting framework mentioned previously. *Id.* Under this framework, the plaintiff bears the initial burden of proving a prima facie case under the TPPA, and, if he does so, he creates a rebuttable presumption that his employer unlawfully retaliated against him. *Id.* at 112 (quoting *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 780–81 (Tenn. 2010)). The burden then shifts to the defendant to come forward with a legitimate, non-retaliatory reason for its actions. *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 797 (M.D. Tenn. 2010). If the defendant articulates a legitimate, non-retaliatory reason for its discharge of the plaintiff, the burden shifts back to the plaintiff to show that the proffered reasons are pretextual. *Id.*

Defendants contend that plaintiff cannot meet the stringent standard of demonstrating that his refusal to participate or remain silent was the sole reason for his discharge because plaintiff recognizes he was terminated for falsifying records [Doc. 29, pp. 22–23]. Further, defendants argue that plaintiff cannot rely on the sequence of his termination "after" he allegedly refused to participate or remain silent because under the TPPA, temporal proximity is not sufficient to establish a causal relationship [*Id.* at 23].

Plaintiff, in response, reiterates his argument under the causation element of his FCA claim, stating that the amended complaint shows how the non-retaliatory reasons for

his termination were "trumped-up" based on his refusal to participate or remain silent [Doc. 31, p. 24]. Additionally, plaintiff asserts that "when applying the more lenient motion to dismiss standard[,]" defendants' attacks on plaintiff's establishment of causation are improper [*Id.*].

The Court finds, construing the facts in the light most favorable to the plaintiff, that plaintiff has sufficiently pled that defendants' sole reason for terminating him was his refusal to remain silent regarding their illegal activities. Defendants mischaracterize plaintiff's amended complaint when it argues that plaintiff acknowledged non-retaliatory reasons for his termination, and thus, plaintiff failed to allege that he was terminated *solely* for refusing to stay silent about illegal activities. What plaintiff actually alleges is that although he received numerous accolades and positive performance evaluations during his employment as well as no write-ups or disciplinary actions, after he continuously complained about defendants' illegal activities, his supervisors gave him unrealistic in-person sales call requirements, feigned satisfaction with plaintiff's performance under such requirement, took unprecedented issue with how plaintiff logged his company car miles, and finally terminated him [*See* Doc. 24 ¶¶ 35–44, 52, 63, 81–82, 84, 87, 99, 102, 107–10, 120, 126–60]. Taking these allegations as true, for the purposes of this motion to dismiss, plaintiff has sufficiently alleged that his complaints of defendants' illegal activities were the reason for his termination, and that the "non-retaliatory" reasons defendants gave for plaintiff's termination were nothing more than pretext.

35

Regarding defendants' arguments of temporal proximity, "the Tennessee Supreme Court has [] held that acute temporal proximity between protected activity and an adverse employment action constitutes circumstantial evidence of causation, triggering the employer's burden to submit proof of its reason for the adverse action." *Russo v. Moore Ingram Johnson & Steele, LLP*, No. 3:20-cv-820, 2022 WL 1787102, at *25 (M.D. Tenn. June 1, 2022) (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 31 (Tenn. 2011)). And therefore, plaintiff's allegation of acute temporal proximity between his refusal to remain silent and defendants' termination of him is sufficient to give rise to an inference of a causal connection.

Accordingly, defendants' motion to dismiss is **DENIED** with respect to plaintiff's TPPA claim.

## IV. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss [Doc. 28] is **DENIED**.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

36